**Shay LIBERMAN, Plaintiff,**

v.

**Nicholas F. BRADY, Secretary, Department of the Treasury, Internal Revenue Service, Defendant.**

**No. CV 93-0107 (ADS).**

United States District Court, E.D. New York.

May 29, 1996.

Shay Liberman, Central Islip, New York, Pro Se.

Zachary W. Carter, United States Attorney, Eastern District of New York, by Stanley N. Alpert, Assistant U.S. Attorney, Brooklyn, New York, for defendant.

## MEMORANDUM DECISION AND ORDER

SPATT, District Judge.

The plaintiff Shay Liberman (the "plaintiff" or "Liberman") appearing *pro se*, brought this Title VII employment discrimination action against the Internal Revenue Service ("the defendant" or "the IRS") alleging that he was not promoted and was discharged because of his national origin and his religion. The plaintiff's *pro se* complaint alleges that he was employed by the IRS as a taxpayer service representative in the Smithtown office. The complaint states that "between April 1990 up to August 1991, Shay Liberman suffered discrimination on the job. The discrimination (was) based on his religion (Jewish) and national origin (Israeli)." The complaint further alleges a specific act of discrimination in that "his manager commented that Shay Liberman could not perform the duties of a taxpayer service representative working the front desk because of his accent."

## DISCUSSION

### I. The Applicable Law—The Standards in a Title VII Case

The plaintiff's employment discrimination lawsuit against the IRS is brought under Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000 *et seq.*).

### A. McDonnell Douglas—Burdine— Hicks Pretext Cases

■ Title VII of the Civil Rights Act of 1964 makes it an unfair employment practice for an employer to discriminate against any individual with respect to the terms and conditions of employment because of such individual's race, color, religion, sex, or national origin; or to limit, segregate or classify his employees in ways that would adversely effect any employee because of the employee's race, color, religion, sex, or national origin. *Fisher v. Vassar College,* 70 F.3d 1420, 1432 (2d Cir.1995); *Bridgeport Guardians, Inc. v. City of Bridgeport,* 933 F.2d 1140 (2d Cir.), *cert. denied,* 502 U.S. 924, 112 S.Ct. 337, 116 L.Ed.2d 277 (1991).

■ In this action, the plaintiff apparently alleges a "disparate treatment" Title VII claim. To establish a discriminatory treatment claim under Title VII, proof of discriminatory motive is critical. Discriminatory motive can be proved by direct or circumstantial evidence, though most often a Title VII plaintiff "is usually constrained to rely on the cumulative weight of circumstantial evidence." *Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir.1991).

■ As stated recently in *Fisher v. Vassar College, supra*, a Title VII claim, including one alleging discriminatory treatment, is generally tried in a three-step process. In the seminal case of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court devised a three-tiered burden shifting framework in Title VII cases. In the first tier, the plaintiff must prove a *prima facie* case, which, in a national origin and religious discrimination case such as this, consists of four elements: (1) that the plaintiff is a member of a protected class; (2) that the plaintiff was qualified for the position he held at the time he was not promoted and was terminated; (3) that the plaintiff was not promoted and was terminated from his position; and (4) that the failure to promote him and his termination occurred in circumstances giving rise to an inference that it was based on the plaintiff's national origin or religion.

■ The next two tiers are described in *Fisher*, as follows:

If the plaintiff presents a *prima facie* case, the burden shifts to the employer, who is required to demonstrate "some legitimate, nondiscriminatory reason" for the decision. *Id.* The employer's burden here is one of production of evidence rather than one of persuasion. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The defendant need only articulate—but need not prove—the existence of a nondiscriminatory reason. *Id.* at 254–56, 101 S.Ct. at 1094–94.

If the defendant carries this burden of production, the plaintiff then assumes the burden to "show that [the employer's] stated reason for [the plaintiff's] rejection was in fact pretext." *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. at 1825. "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093. In *St. Mary's Honor Ctr. v. Hicks*, [509] U.S. [502], 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), the Supreme Court held that, as to the third prong of the *McDonnell Douglas* test, it is not enough for a plaintiff to show that the defendant's legitimate, non-discriminatory reason for its employment decision is pretextual; the plaintiff must also prove by a preponderance of the evidence that defendant's stated reason is "a pretext *for discrimination.*" *St. Mary's*, [509] U.S. at [515], 113 S.Ct. at 2752 (emphasis added). The plaintiff must establish "*both* that the reason was false, *and* that discrimination was the real reason."

*Id.* at 1433 (emphasis in original).

■ As stated above, under the third tier of the *McDonnell Douglas* pattern, as clarified in *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 510, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993), even if the trier of fact rejects the defendant's purported nondiscriminatory reasons, the burden of proving that the motivation for the failure to promote and to terminate the plaintiff was unlawful remains with the plaintiff. *St. Mary's Honor Center v. Hicks, supra*, 509 U.S. at 510, 113 S.Ct. at 2749 (1993) ("[T]he Court of Appeal's holding that rejection of the defendant's proffered reasons *compels* judgments for the plaintiff ... ignores our repeated admonition that the Title VII plaintiff at all times bears the 'ultimate burden of persuasion.'") (emphasis in original).

■ Thus, even if the defendant's reasons are found to be pretextual, the plaintiff must, nevertheless, prove that he was not promoted and was terminated as a result of intentional discrimination. "It is not enough ... to disbelieve the employer: the factfinder must *believe* the plaintiff's explanation of intentional discrimination." *Hicks*, 509 U.S. at 519, 113 S.Ct. at 2754 (emphasis in original). However, this proof may be inferred from

proof of the four elements of the *prima facie* case. *See also DeMarco v. Holy Cross High School,* 4 F.3d 166, 170 (2d Cir.1993) (Proof that the employer has provided a false reason for its action permits the finder of fact to determine that the defendant's actions were motivated by an improper discriminatory intent, but does not compel such a finding.).

### B. *Mixed Motive Theory*

 Employment discrimination cases fall into one of several categories, including "pretext" cases, discussed above, and "mixed motive" cases. *See Tyler v. Bethlehem Steel Corp.,* 958 F.2d 1176 (2d Cir.), *cert. denied,* 506 U.S. 826, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992). These two approaches involve different analyses. Under a mixed motive theory, a plaintiff "must initially show more than the 'not onerous' *McDonnell Douglas–Burdine* factors." *Id.* at 1181. If the plaintiff is able to produce evidence to establish that an illegitimate factor played a motivating or substantial role in the challenged employment decision, the defendant is then given an opportunity to prove an affirmative defense, namely, that the defendant " 'would have reached the same decision as to [the employee's employment] even in the absence of the' impermissible factor." *Id.* quoting from *Mt. Healthy City School District Board of Ed. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) and *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989).

 The question is what does the plaintiff have to show in order for the burden to shift to the defendant. In the Second Circuit, the plaintiff is required to submit "enough evidence that, if believed, could reasonably allow a jury to conclude that the adverse employment consequences were 'because of' an impermissible factor." *Id.* at 1187. The Second Circuit rejected the notion that the plaintiff must introduce "direct" evidence of discrimination (such as an admission by the decisionmaker that "I fired the plaintiff because she was a woman") as opposed to circumstantial evidence. *Id.* at 1185–1187. However, if the plaintiff relies on circumstantial evidence, "that circumstantial evidence must be tied directly to the alleged discriminatory animus." *Ostrowski v. Atlantic Mutual Insurance Companies,* 968 F.2d 171, 182 (2d Cir.1992).

 In *Ostrowski,* Judge Kearse explained that the plaintiff would not be entitled to a 'mixed motive' burden shifting instruction based on (1) purely statistical evidence; (2) mere evidence of the plaintiff's qualification for, and the existence of, a certain position; or (3) 'stray' remarks in the workplace by persons not involved in the relevant decisionmaking process. *Id.* at 182. In other words, evidence that would satisfy the requirements of a *McDonnell Douglas prima facie* case, would not necessarily justify a *Price Waterhouse* 'mixed motive' analysis. Statistical evidence that is "directly tied to the forbidden animus, for example policy documents or statements of a person involved in the decisionmaking process that reflect animus of the type complained of in the suit" will entitle the plaintiff to a burden shifting instruction. *Id.* To qualify for a 'mixed motive' instruction, the plaintiff must introduce "evidence of conduct . or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged discriminatory attitude, and that evidence [must be] sufficient to permit the factfinder to infer that the attitude was more likely than not a motivating factor in the employer's decision." *Id.*

### C. *Pro Se Standard*

 As in the Court's prior decision rendered in *Liberman v. INS,* CV 93–4375(ADS), the Court again recognizes the rule regarding *pro se* litigants, that their pleadings are held "to less stringent standards than formal pleadings drafted by lawyers" *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 596, 30 L.Ed.2d 652 (1972), and the Second Circuit instructs that a "*pro se* litigant should be afforded every reasonable opportunity to demonstrate that he (or she) has a valid claim." *Bobal v. Rensselaer Polytechnic Inst.,* 916 F.2d 759, 762 (2d Cir. 1990), *cert. denied,* 499 U.S. 943, 111 S.Ct. 1404, 113 L.Ed.2d 459 (1991) (quoting *Satchell v. Dilworth,* 745 F.2d 781, 785 (2d Cir.

1984)). *See also Ruotolo v. Internal Revenue Service,* 28 F.3d 6 (2d Cir.1994).

■ It is further noted that under the circumstances in this case, the Court arranged for the Civil Litigation Fund of the Eastern District of New York, a non-profit organization, to pay for the witness fees of two witnesses subpoenaed into court by the *pro se* plaintiff. This payment by the Civil Litigation Fund is not a payment by the Federal Court itself. This circuit and others has held that "federal courts are not authorized to waive or pay witness fees on behalf of an *in forma pauperis* litigant." *See Malik v. Lavalley,* 994 F.2d 90 (2d Cir.1993); *Tedder v. Odel,* 890 F.2d 210, 211–12 (9th Cir. 1989) (per curiam); *Boring v. Kozakiewicz,* 833 F.2d 468, 474 (3d Cir.1987), *cert. denied,* 485 U.S. 991, 108 S.Ct. 1298, 99 L.Ed.2d 508 (1988); *McNeil v. Lowney,* 831 F.2d 1368, 1373 (7th Cir.1987), *cert. denied,* 485 U.S. 965, 108 S.Ct. 1236, 99 L.Ed.2d 435 (1988); *Cookish v. Cunningham,* 787 F.2d 1, 5 (1st Cir.1986) (per curiam); *United States Marshals Service v. Means,* 741 F.2d 1053, 1056–57 (8th Cir.1984); *Johnson v. Hubbard,* 698 F.2d 286, 289–90 (6th Cir.), *cert. denied,* 464 U.S. 917, 104 S.Ct. 282, 78 L.Ed.2d 260 (1983).

■ The Court also recognizes that it must make reasonable allowances so that a *pro se* plaintiff does not forfeit his rights by virtue of his lack of legal training. *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983). But the Court is also aware that *pro se* status " 'does not exempt a party from compliance with relevant rules of procedural and substantive law.' " *Id.* (quoting *Birl v. Estelle,* 660 F.2d 592, 593 (5th Cir.1981). Furthermore, *pro se* litigants are

> generally required to inform themselves regarding procedural rules and to comply with them. *Edwards v. INS,* 59 F.3d 5, 8 (2d Cir.1995). This is especially true in civil litigation. *See McNeil v. United States,* [508 U.S. 106, 113] 113 S.Ct. 1980, 1984, [124 L.Ed.2d 21] (1993) (suggesting that procedural rules in ordinary civil litigation should not be "interpreted so as to excuse mistakes by those who proceed without counsel").

*LoSacco v. City of Middletown,* 71 F.3d 88, 92 (2d Cir.1995).

## II. *The Trial—Findings of Fact*

This opinion and order includes the Court's findings of fact and conclusions of law as required by Fed.R.Civ.P. 52(a). *See Colonial Exchange Ltd. Partnership v. Continental Casualty Co.,* 923 F.2d 257 (2d Cir.1991). During this discussion, the Court will make findings of fact, which will be supplemented by additional findings later in the opinion.

The plaintiff commenced employment with the IRS on July 20, 1987. The plaintiff's national origin is the State of Israel. He speaks English with a clearly noticeable accent. At the time he started to work for the IRS, he was also employed at the Immigration & Naturalization Service ("INS"). In addition, the plaintiff was also working for Marget Security, a brokerage house. For a short period of time, namely between July 20, 1987 and September 15, 1987, the plaintiff had three jobs, as a taxpayer service representative for the IRS, an immigration inspector for the INS, and a stockbroker for Marget Security. He was terminated from his INS position on September 15, 1987. His employment with INS was the subject of another employment discrimination lawsuit, similarly based on his religion and national origin, which was decided by this Court in an opinion dated March 6, 1996.

As stated above, the plaintiff was first employed by the IRS on July 20, 1987. After a six-week training period, the plaintiff passed a test and assumed the position of taxpayer service representative in the Smithtown, Long Island IRS office. A taxpayer service representative provides assistance to taxpayers by answering questions and helping them prepare their tax returns. The plaintiff was terminated by the IRS as of September 6, 1991, so that he worked for the IRS for a period of approximately four years and two months.

Testifying in a narrative manner and in response to questions by the Court, the plaintiff related the alleged discriminatory acts suffered by him. The plaintiff's main contention in regard to discrimination was that his superior, IRS Taxpayer Service Rep-

resentative Supervisor Connie Casiano was impolite to him, reprimanded him in front of taxpayers in a loud and demeaning manner and treated him more harshly than his co-employees. Supervisor Casiano is sometimes referred to as Manager Casiano. The plaintiff stated that Casiano acted in this manner to him "almost every day" between April 1990 and August 1991. For example, he testified that she said to him, "Why did you do this?", "Why did you do that?", and "I don't know what you are doing here." In addition, the plaintiff complained that Casiano had a habit of introducing herself to taxpayers being interviewed by him and criticizing his work in a loud voice. According to the plaintiff, Casiano loudly criticized him within the hearing of twenty to thirty other taxpayers who were sitting nearby, awaiting their turn to speak to an IRS representative. This conduct by Casiano embarrassed the plaintiff in the presence of the taxpayers.

Asked if he complained about this conduct by Casiano, the plaintiff stated that he did so by writing to her on three occasions. On January 14, 1991 (Plaintiff's Exh. 6), on January 16, 1991 (Plaintiff's Exh. 7) and on March 29, 1991 (Plaintiff's Exh. 8). In these written communications, the plaintiff requested a meeting with a management official "other than my supervisor," in the presence of his union representative. He also disputed his evaluations, stating that "I consider the evaluations a falsification of employment records" and requested "a formal hearing" (Plaintiff's Exh. 7). Notwithstanding Liberman's attempts to speak to another management official, Casiano denied his requests. Liberman testified that when he finally was able to talk to Noreen Hoenig, the Branch Chief, she told him that she did not want to talk to him about Casiano.

Liberman testified that Casiano apparently had a grudge against him. However, he conceded that Casiano was the only person in the IRS office who treated him in this manner. Further, he testified that, other than the actions by Casiano, there were no other discriminatory acts done to him. In addition, Liberman conceded that he never heard Ca-

siano say anything about his accent, his religion or his being an Israeli.

When urged by the Court to relate "anything else about your case," Liberman testified about two additional incidents concerning Casiano. He stated that on January 16, 1990, war broke out in Israel and he wanted to return to his native land. He told Casiano that he would like to use his sick days and vacation days to make the trip to Israel. According to Liberman, Casiano issued a memorandum to the effect that he had already used his sick days. Liberman has no copy of this purported memorandum. In any event, Liberman made the trip to Israel. Upon his return, the plaintiff produced a note from a doctor in Israel stating that he was ill while in Israel. The Court finds that this physician's note was not factually correct and constituted an improper attempt by Liberman to obtain a false sick leave excuse for his trip (Tr. 161–163).*

The second incident occurred on Christmas Eve, December 24, 1990. At that time, there were no taxpayers in the office and the employees apparently were celebrating. Tomas, a co-employee was at the front desk reading a newspaper. When Liberman also tried to read a newspaper, Casiano, on her way to the ladies room, told him "Shay, find something to do." However, on her way back from the ladies room, seeing that Liberman was still reading the newspaper, she said "Shay, go home." The Court finds that neither of these incidents are in any way evidence of discrimination.

On cross-examination, Liberman testified that the IRS office in Smithtown was a "friendly, enjoyable work environment." Further, he admitted that he got an initial "nice evaluation" from Casiano. Also, he stated that he did not feel as aggrieved against the IRS as he did with the INS, as the IRS people were "straightforward with me."

Liberman is a man with many varied vocational and career interests, including engineering studies, acting as a security officer for El Al, studying economics, designing a digital clock, medical electronics, insurance,

* Refers to the pages of the Trial Transcript.

financial planning and working as a stockbroker.

Liberman was asked to explain how he could work three jobs—with IRS, INS and Marget Securities—at the same time. Liberman explained that he worked for IRS from 8:00 a.m. to 4:00 p.m. but he always left earlier, at approximately 3:00 p.m. so he could get to the INS job by 4:00 p.m. The hours of his INS job were from 4:00 p.m. to midnight, or later, sometimes as late as 4:00 a.m. Liberman's multiple employment situation is difficult to fathom as he stated that the IRS job was for a 40–hour week, while the INS job "was more than 40 hours," a seemingly improbable feat. While he was working for INS, IRS and Marget Securities he stated that he was working "around the clock," in excess of eighty hours a week. Asked to explain how he managed to work these two full-time and one part-time job at the same time, Liberman stated that he would shower at INS, not sleep at home at all, go directly to IRS at 6:00 a.m. and take a nap in his car. Liberman also conceded that he took INS sick days while he was working for the IRS.

Asked about his termination from the INS, the plaintiff conceded that the deficiencies in his job performance with that agency—a subject discussed in the Court's prior decision dated March 6, 1996—were substantially true and correct. Further, he did not believe that there was a conspiracy against him by the IRS and INS.

On July 10, 1987, Liberman received a copy of the IRS "Handbook of Employee Responsibilities and Conduct," and signed a form agreeing to familiarize himself with its contents and to abide by its instructions. (Defendant's Exh. A). However, Liberman stated that while he signed the form he didn't read the contents of the Handbook because he trusted the Government. One of the rules in the Handbook is that he would have to obtain approval by the IRS in order for him to work at INS. No such approval was obtained by Liberman, who stated that in so doing he took a "shortcut."

Liberman discussed Israel and his religion with his fellow employees at IRS, and he conceded that no one made pejorative remarks to him or about him on these subjects, or with regard to his accent:

Q In any discussions that you ever had with anybody at the IRS in connection with anything about Judaism or Jewish holidays, nobody at the IRS ever made fun of you?

A No, nobody.

Q And nobody made any pejorative remarks to you about any Jewish practices or anything having to do with Judaism?

A I mean we had a very good relationship with other employees of the IRS.

Q And nobody at the IRS made any pejorative remarks to you about the fact that you come from the state of Israel, right?

A No, not whatsoever.

Q In fact, you have absolutely no evidence or indication that any reprimands that you ever received at the IRS had any connection to either the fact that you are Jewish or that you come from Israel, right?

A I mean—you see the fact that I was Jewish, I don't think that anybody was against it. The fact that I was Israeli, I don't think anybody was against it.

Q Thank you.

Now, no one at the IRS ever said directly to you that they had anything against your accent, right?

A Are you talking about an employee or taxpayers?

Q Anybody from the IRS, employees, supervisors?

A No.

Q And in fact, your first evaluation at the IRS was quite positive, wasn't it?

A I have it here. The first and the second and the third probably. Definitely the first and the second.

Q What were the dates on the first and the second?

A The first one, I believe, that I have is March 14, 1988.

Q And then the next one, if you have?

A April 6, 1990.

Q Okay.

Do you recall that period you received positive evaluations, correct?

A Job element rating three. All true. I don't know exactly what that means, but I believe it is positive.

Q Mr. Liberman, did anybody ever say anything in one of your written evaluations at any time while you worked for the IRS about your accent?

A No.

(Tr. at 164–165).

Liberman testified that his first and second IRS evaluations were good and admitted that his accent had nothing to do with his later poorer evaluations.

As stated above, his treatment by Supervisor Connie Casiano is the sole basis for Liberman's claim of national origin and religious job discrimination. Liberman testified that Casiano had a "loud tone of voice," not only with him but with everyone. While Liberman complained of Casiano's treatment of him, he conceded that in certain instances she was justified in criticizing him:

Q So isn't it true that although she didn't feel it was handled right there were certainly instances where it was justified for her to criticize your work performance, right?

A Yes.

. . . .

Q And certainly on Christmas Eve when you were sitting in the waiting area reading the newspaper and she asked you to do some work and you didn't and she came back ten minutes later and found you still reading the newspaper, certainly it was justified for her to criticize you for that, wasn't it?

A Justified? Maybe.

. . . .

Q Now, you will at the least agree with me that—strike that.

Is it true that Ms. Casiano was justified in criticizing you for your performance with respect to the contact cards?

A Yes, she did, yes. I'm sorry.

Q Do you believe she was justified in criticizing you with respect to the contact card?

A Yes.

(Tr. at 168–169, 173).

With regard to the critical issue concerning his accent, Liberman testified that one of his main purposes as a taxpayer service representative, was to "serve the taxpayers." He admitted that a court reporter working at this trial was on at least one occasion confused by his accent, and, significantly, other people at IRS were on occasion confused by his "very heavy" accent:

Q Mr. Liberman, let me digress for a second.

In your last answer you said that you had to serve the taxpayers, right?

A Yes.

Q And the court reporter asked you whether you said did you have to sell something, right?

A He did ask me that, yes.

Q And that was one instance, wasn't it, where a person got confused because of your accent, right?

A Yeah.

Q And it's the truth that at the IRS there were sometimes, not very often, but sometimes that people got confused by your accent?

A It's very true, Mr. Alpert. I agree with you totally.

Q Did it happen often?

A Accent—accent—you see I try, since I have a very heavy accent, I try to talk slow and loud and specify the word the best way I can. Some people catch up fast with this, some people need more time with this, some people are very confused with it. I remember where it happened where people didn't understand me.

Q Sometimes that happened at the front desk?

A Front desk you really don't talk very much because most of the talking is done when you serve a taxpayer behind the table and you really go into problems.

Q So certainly if someone were focusing on the front desk they wouldn't pick out your accent to focus on?

A They would pick out my accent from the first sentence I talk to, yes. But if I have to have a 20 minute conversations with the taxpayer, it's different than I just have to respond to some formes they would used (sic).

(Tr. at 175–176).

In this regard, Liberman testified that he never asked to work at the front desk and he was never prevented from working at that position. In fact, Liberman did work at the front desk on several occasions. Asked how many times he sat at the front desk, Liberman responded "It can be 10, it can be 100. I don't have any idea." Significantly, Liberman testified at his deposition that Casiano assigned him to the front desk from time to time. He even admitted, although reluctantly, that he was not treated differently with regard to assignments to the front desk. The Court finds that, with regard to working at the front desk, the plaintiff was, on occasion, asked to do so by Supervisor Casiano. Further, the Court finds that the plaintiff was not treated differently than the other taxpayer service representatives with regard to assignments to work at the front desk.

In March 1991 his fellow employee Elizabeth Lulkin told the plaintiff that Casiano said that she was not able to use Shay Liberman at the front desk because "people would possibly be offended because of his accent ... you know what I mean." The Court tried to establish the approximate date Lulkin heard Casiano make this remark, without success. The best approximate date is at the beginning of 1991.

Elizabeth Lulkin was subpoenaed by the *pro se* plaintiff and was a reluctant witness. She repeatedly testified that the incidents involving Shay Liberman occurred a long time ago and she doesn't remember much. Lulkin commenced her employment with the IRS in 1973 and is still employed by that agency. She stated that by testifying in this case, her "future potential" could be affected.

Lulkin testified that she was in the taxpayer service unit in Smithtown during the years the plaintiff was employed in that unit. She did not socialize with the plaintiff. Lulkin knew Connie Casiano, the manager of the taxpayer service unit. She testified that she told Liberman "something" that had happened. She testified with regard to this occurrence in the EEOC hearing. While she does not recall the substance of her testimony at the EEOC hearing, she stated at this trial that her answers in the EEOC hearing were truthful. At the EEOC hearing, she testified as follows:

Question: What did she (Casiano) say?

Answer: Literally word for word, I won't be able to quote it exactly, but it was the effect or very close of they were looking for a person to cover the front desk because an employee had just retired. So I guess it must have been the beginning of the year because he retired I think in November or October and she made the comment that Shay would not be able to do because people would possibly be offended because of his accent.

(Tr. at 309).

Lulkin confirmed her testimony at the EEOC hearing:

THE COURT: Well, let's make it clear. You heard what you testified before the EEOC.

THE WITNESS: Right.

THE COURT: Was that what you heard from—

THE WITNESS: Correct.

THE COURT: It was the truth?

THE WITNESS: Correct.

THE COURT: So Ms. Cassiano did say that she would not be able to use Shay Liberman because people could possibly be offended because of his accent?

THE WITNESS: Correct.

(Tr. at 310).

Lulkin further testified that she was upset by Casiano's remark and told Liberman about it. Apparently there was no retaliation against Lulkin by the IRS because she was later promoted and no pressure was brought against her with regard to her testimony at this trial.

The Court notes that Connie Casiano, the retired IRS taxpayer service manager, was not produced as a witness. Casiano retired in December 1993 and now lives in South

Carolina, so that the plaintiff could not have subpoenaed her. While the IRS had no legal obligation to produce a former employee, the Court finds that, as a probable pensioner, she could have been brought into court.

Under all of the circumstances, the Court credits the testimony of witness Elizabeth Lulkin, and finds that Supervisor Connie Casiano did make the statement that "she would not be able to use Shay Liberman (at the front desk) because people would possibly be offended because of his accent."

The Court heard testimony and inquired as to the duties of the person at the front desk, and the effect of having someone with a heavy accent at the front desk. Lulkin testified that Liberman's accent "can possibly cause you to have to work extra hard" to do the necessary work. Significantly, Lulkin testified that if the plaintiff did not "slow down," his accent could cause communication problems, but she didn't recall any such problem.

In addition to his other problems at IRS, the plaintiff candidly admitted that he falsified the records with regard to how many customer contact cards he received during the course of the working day. For each customer he served as a taxpayer service representative, he received a contact card. He was supposed to accurately record the number of contact cards he received each day. Liberman testified that he falsified these contact card records because he felt that the system of contact cards didn't fairly represent the work he was doing.

In 1990, the plaintiff became aware that the IRS was investigating his activities in connection with certain allegations of improper conduct on his part involving his solicitation of a taxpayer with regard to financial services. On July 5, 1990, he was interviewed by Special Investigator William Zybul in the presence of a union lawyer, who represented him. Curiously, Liberman does not remember if he made any complaint to Zybul about Casiano's conduct. Surely this was an opportunity to advise an IRS investigator about Casiano's harassing conduct, and yet, he apparently did not do so, nor did he ever instruct the union lawyer, who was at his disposal, to bring a grievance against Casi-

ano. Liberman testified that the first complaint he made about Casiano was on March 14, 1991 to the EEOC, after he found out from Elizabeth Lulkin that Casiano had made a remark about his accent.

Three non-discriminatory reasons were advanced by the defendant for terminating the plaintiff. The reasons are set forth in a "Notice of Proposal (sic) Adverse Action" addressed to Shay Liberman and dated May 3, 1991 (Plaintiff's Exh. 2). The plaintiff admitted that he received and signed for this Notice. In the Notice it is stated that the IRS "proposed to remove you from the service or otherwise discipline you" based on three reasons. The first reason and the specifications supporting the reason, is as follows:

*Reason 1:* While on official duty in your position of Taxpayer Service Representative in the Smithtown post-of-duty, you handed out to taxpayers unsolicited personal business cards for financial services, in violation of Section 223 of document 7098 Rules of Conduct.

*Specification 1:* On January 8, 1990, while assisting Taxpayer A, you handed him a business card from Vantage Financial Services, Inc. The card was personalized "Shay Liberman, Investment Representative".

*Specification 2:* On February 20, 1990, while assisting Taxpayer B, you handed him a business card from Vantage Financial Services, Inc. The card was personalized "Shay Liberman, Investment Representative".

*Specification 3:* On February 28, 1990 you were assisting Taxpayer C concerning a lien on his ex-wife's bank account. The taxpayer asked for your card because he wanted to discuss the matter with his ex-wife. You handed him a business card from IDS. The card was personalized "Shay Liberman, Personal Financial Planner".

*Specification 4:* In an interview on July 5, 1990 with Representatives of the Inspection Service, you admitted that you could have given out anywhere from 20 to 100 cards from any one of three companies:

Vantage Financial Services, Inc., International Investors Center, Inc., or IDS Financial Services, Inc.

The second non-discriminatory reason, closely related to the first reason, as set forth in the Notice, reads as follows:

*Reason 2:* You conducted outside employment activities as a Financial Consultant/Representative without permission, in violation of Section 225.1 and 226 of Document 7098, Rules of Conduct.

*Specification 1:* In a signed statement given to representatives of the Inspection Service, dated November 21, 1990, Smithtown post-of-duty Taxpayer Service Representative Margaret Muller advised that she observed and overheard you on several occasions discussing appointments with people and the sale/investment/purchasing of stocks, bonds and gold. On numerous occasions you were overheard making telephonic appointments and leaving messages on answering machines.

*Specification 2:* On March 13, 1990 you returned a telephone call to the ex-wife of Taxpayer C, after having given the taxpayer a personal business card. You left a message on her answering machine that if her call had anything to do with a tax problem she would have to go to the IRS; that you were only involved in financial planning.

*Specification 3:* During an interview with representatives of the Inspection Service on December 4, 1990, after being confronted with a copy of your tax return for Schedule C, Sole Proprietorship, "Investors Center, Inc". with income of $72.00 and expenses of $6,383.00, you stated that you were conducting business activities. You further stated that you did not request permission for outside employment at the time you incurred these expense, and that you had not requested permission as of that date, even though you have been informed of the regulations in an earlier interview on July 5, 1990.

When he was questioned about this activity of handing out unsolicited business cards to taxpayers, Liberman admitted that he gave out his stock brokerage business cards, but claims that he did so only when solicited by the taxpayers. Liberman also conceded that this practice of his giving out these business cards was wrong. He further admitted that he handed out between 20 and 120 business cards and that he discussed personal "outside stock investments" with taxpayers.

Q Let's talk about this business card. You handed out your business cards at the IRS building on frequent occasions?

A Yes.

Q In fact, it may have been as many as a hundred times?

A Maybe.

. . . .

Q You didn't have business cards for the IRS; did you?

A No.

Q You had business cards for your business activities outside of the IRS; correct?

A That is correct.

Q In fact, you mentioned a couple of companies—in fact there were three or four companies—

A There were more, but in the interval of time—so I had more companies. I work probably five, six, seven, eight companies during my time I work as a stock broker.

. . . .

Q While you were working at the IRS, didn't you hand out cards for Vantage Financial Services, Inc., International Investment Services, Inc., and IDS Financial Services, Inc.?

A Yes.

(Tr. at 395–397).

In the inquiry about whether the plaintiff handed out his stock brokerage cards to taxpayers, solicited by the taxpayers, the Court finds it difficult to believe that the taxpayers would know that the plaintiff was a stockbroker without some statement on his part. The Court finds that, on occasion, the plaintiff, unsolicited, offered his stock brokerage business cards to taxpayers.

On October 4, 1989 Liberman signed an Acknowledgement of Receipt of the IRS Rules of Conduct (Defendant's Exh. C).

Among the IRS Rules of Conduct is the fundamental principle with regard to outside employment that "The outside activity does not place the employee in a situation where there may be a possible conflict, or the appearance of a conflict, between his or her private interests and his or her official duties and responsibilities." The Rules also state that "The employee will not in any manner advertise or make it known that he or she works for the Service in order to generate or enhance business" (Defendant's Exh. D, Section 223).

Reason three contained in the IRS Notice of Proposed Adverse Action (Defendant's Exh. D), advanced in this lawsuit as a non-discriminatory reason, concerns alleged false statements made by the plaintiff, and reads as follows:

*Reason 3:* You made false statements concerning matters of official interest, in violation of section 214.5 of Document 7098, rules of Conduct.

*Specification 1:* In an interview on July 5, 1990 with representatives of the Inspection Service, you advised that although you handed out personal business cards to taxpayers from Vantage Financial Services, Inc., International Investors Center, Inc., and IDS Financial Services, Inc., you were not conducting personal business.

*Specification 2:* On Standard Form 171, Application for Federal Employment, dated January 12, 1989, you listed as the reason for leaving employment with Immigration and Naturalization Service as "job opportunities". Records indicate that you were terminated during the probationary period from your position at Immigration and Naturalization Service effective September 15, 1987.

*Specification 3:* On Standard Form 171, Application for Federal Employment, dated January 12, 1989, you answered "no" to question 39, were you fired from any job for any reason, did you quit after being told you would be fired, or did you leave by mutual agreement because of specific problems?" Records indicate that you were terminated during the probationary period from your position at Immigration and Naturalization Service effective September 15, 1987.

*Specification 4:* In an interview on December 9, 1990 with representatives of the Inspection Service, you were shown the SF–171, Application for Federal Employment, dated January 12, 1989, and asked whether any item on the form needed to be corrected. You stated that the application was correct. You were then asked to review question 39 regarding firing and you again stated that the form was answered correctly. When you were asked to explain why you were fired on September 15, 1987 from Immigration and Naturalization Service, you stated that you had a personal conflict with your supervisor and that you were not fired for job performance. You then stated that you would never state on any application that you were fired; and that you had filed other applications for various positions stating that you were never fired, and that you will continue to do so.

With regard to Specification 1, Liberman conceded that his statement that he was "not conducting personal business" was false.

Q Reason three says you made false statements concerning matters of official interest in violation of Section 214.5 of document 7098, Rules of Conduct. Is specification one true?

A I would say that I was conducting personal business. Even so monetarily it—I did not produce. But I was conducting personal business.

Q You agreed you were conducting personal business?

A Yes.

. . . .

Q But it is true that you engaged in the handing out of your personal business cards with taxpayers who came into the IRS, right?

A Yes, it's true. I gave my personal business card to taxpayer and as I say a number of times, I don't know how many between 20 to 100.

(Tr. at 247–248).

Liberman also conceded that he made the false statement set forth in Specification 2,

with regard to the reason for his leaving INS. The plaintiff made another false statement with regard to his former INS job, when he filled out an IRS update employment application on January 12, 1989 (Defendant's Exh. E). In this application he stated that the reason for his leaving the INS was for "job opportunities," when in fact he was discharged for cause by that Agency. Also, on the same application, Liberman was asked whether "during the last ten years were you fired from any job for any reason" and he answered "No." This was also a false statement by the plaintiff. In a deposition read into the record, the plaintiff admitted that he was fired (Tr. at 405). In addition, the plaintiff conceded that he made a false statement in a form subtitled "outside employment or Business Activity Request" (Defendant's Exh. I) in which he falsely stated that he was working for Burger King in Smithtown "cooking hamburgers." It seems strange that the plaintiff falsely stated that he worked for Burger King but did not disclose his outside stock brokerage work.

Even in the very beginning of his employment, when Liberman first joined the IRS on July 10, 1987, he made a material false statement when he answered questions on a form entitled "Supplemental Information for Appointment" (Defendant's Exh. A). The first question on the form stated:

1. Are you now engaged in employment, work, or business (a) prohibited by the IRS, or (b) requiring prior approval of the IRS? (See 230 of IRM 0735.1, Handbook of Employee Responsibilities and Conduct.) If so, and if you wish to continue such employment, please submit Form 7995 through supervisory channels for decision.

Liberman's answer to this question, which called for him to reveal his then concurrent employment with the INS, was "No."

### III. *Additional Dispositive Findings*

 Initially, in this discriminatory treatment claim under Title VII, the Court must determine the appropriate standard applicable in this case. While this is a close ques-

tion, the Court determines that the plaintiff has produced sufficient evidence of discriminatory intent to be afforded the benefit of the "mixed motive" theory. The plaintiff has proved direct evidence of national origin discrimination by the supervisor of the taxpayer service representatives at the IRS Holtsville facility. The Court finds that Supervisor Connie Casiano harassed the plaintiff, spoke harshly to him in front of fellow employees and taxpayers, and treated him differently in an adverse manner than the other employees. Casiano apparently revealed her true feelings when she stated to Lulkin that "people would be offended by his accent."

This evidence is tied directly to a discriminatory animus, (*Ostrowski, supra,* at 182); and does not constitute a "stray remark" in the workplace by a person not involved in the relevant decision-making process. Here, this course of conduct and the revealing discriminatory remark was made by the plaintiff's immediate superior, who was a decision-maker as to his employment future. Thus, the plaintiff is entitled to the burden shifting benefit of the Price Waterhouse mixed motive standard.

Having made this determination, the Court also finds that, despite the remark about Liberman's accent, Casiano did permit him to work at the front desk. Also, the Court finds that it may not be practical to place at the front desk a person with a heavy accent who would not be readily understood by the taxpayers. However, under the facts in this case, the conduct and remarks by Casiano were evidence of discriminatory intent.

 Under the mixed motive standard, the defendant has the burden of proving its affirmative defense that the IRS would have reached the same decisions as to terminating the plaintiff's employment even in the absence of the impermissible discriminatory factor. See *Mt. Healthy, supra,* and *Price Waterhouse, supra.* In this regard, the defendant must prove that it had a legitimate reason to make the adverse employment decisions, that standing alone, without regard to the discriminatory motivation, would have induced it to make the same decisions. *Price Waterhouse, supra* at 252, 109 S.Ct. at 1791. Stated simply under the facts in this case, the defendant had the burden of proving, by a preponderance of the evidence, that it

would not have promoted Liberman and would have terminated him, for a non-discriminatory valid reason having nothing to do with his national origin or his accent. The Court finds that the defendant has clearly met its burden.

The defendant IRS has established, by a preponderance of the evidence, that it had three valid, non-discriminatory reasons for failing to promote Shay Liberman and for ultimately terminating his employment. First, the defendant proved that, while on official duty, Liberman handed out his personal stock brokerage business cards to taxpayers. The Court finds that on occasion, he handed out these business cards without being solicited by the taxpayers. This conduct represented a clear conflict of interest and a violation of the IRS "Rules of Conduct." Section 221 warns the employee that "the Service's extremely sensitive mission and the attendant importance of public relations necessitates certain restrictions." Section 223 sets forth the important principle that the employee makes sure that "outside activity does not place the employer in a situation where there is a possible conflict, or the appearance of a conflict, between his or her private interests and his or her official duties and responsibilities." Liberman used his superior position as a taxpayers service representative having some influence over the taxpayers appearing before him for aid and assistance, to advance his personal stock brokerage business. The Court agrees that, in Liberman's position, this conduct is unacceptable. Liberman knew that this conduct on his part violated the rules and yet he continued to hand out these cards, according to him, from 20 to 100 times.

Second, the IRS proved that Liberman conducted these outside, personal employment activities as a financial consultant, while working as a taxpayer service representative, without permission. By doing so, the plaintiff violated Sections 225.1 and 226 of the IRS "Rules of Conduct." In view of the appearance of impropriety such personal business would engender, it is doubtful whether the IRS would have granted such permission to Liberman. Perhaps that is why he did not make the request.

Finally, the defendant proved a third compelling and non-discriminatory reason for making its adverse employment decisions. The defendant clearly established that the plaintiff made a number of deliberate false statements. Section 214.5 of the IRS "Rules of Conduct" states that "Employees will not intentionally make false or misleading verbal or written statements in matters of official interest." In his updated application for employment dated January 2, 1989, Liberman wrote in his own hand that the reason he left his employment with the Immigration and Naturalization Service was for "job opportunities" (Defendant's Exh. E). He well knew that he was fired by the INS on September 15, 1987 after employment with that agency after less than five months on the job. In fact, on September 1, 1987, the plaintiff received a termination notice which provided a detailed description of his errors. The notice expressly stated that his employment would be terminated on September 15, 1987. (See Memorandum Decision and Order in the case of *Liberman v. Reno*, CV 93–4375(ADS) dated March 6, 1996).

In addition, on the same update application dated January 12, 1989, at question 39, the plaintiff was expressly asked whether, during the last ten years he was "fired from any job for any reason," and he answered "No." This was another intentional false statement, and it was a material misrepresentation. This kind of information would be important to an employer with regard to the future progress of an employee and would possibly have led to an investigation of the plaintiff's activities at INS, which could cause a serious problem in connection with his employment at IRS. To compound his culpable conduct, when questioned by IRS representatives on December 9, 1990, the plaintiff continued to deny that he was fired by INS, and stated that he will continue to make such denials in future job applications.

## IV. *The Defense that the Plaintiff's Claims are Untimely*

The defendant argues that the plaintiff's failure to promote and termination claims are time barred in that Liberman failed to satisfy the exhaustion requirements of Title VII by contacting an EEOC counselor within thirty days of the alleged discriminatory event, or justify why the 30–day period should be

tolled, and to submit a written complaint within 15 calendar days of the final interview with the EEOC counselor. *See* 29 C.F.R. § 1613.214(a)(1). The defendant contends that Liberman has not shown the "extraordinary circumstances" that would justify equitable tolling of the limitation period. *See Royce v. U.S. Postal Service,* 1988 WL 131654 (W.D.N.Y. December 6, 1988) (citing *Miller v. Intern. Tel. & Tel. Corp.,* 755 F.2d 20, 24 (2d Cir.1985), *cert. denied,* 474 U.S. 851, 106 S.Ct. 148, 88 L.Ed.2d 122 (1985); *Smith v. American President Lines, Ltd.,* 571 F.2d 102, 109 (2d Cir.1978)). As the defendant correctly notes, the Second Circuit has held that a plaintiff may defeat a time bar to a Title VII civil suit by asserting subsequent identifiable acts of discrimination related to the time-barred incident, at least where the complaining party files a timely amended or second EEOC complaint, or where the initial charge alleged certain enumerated acts within an alleged "continuing pattern of discriminatory conduct." *Smith, supra,* 571 F.2d at 105–6.

■ Liberman's EEOC complaint focused on his performance ratings and the conduct of his supervisor, with the last enumerated act listed as April 3, 1991. The defendant contends that the conduct Liberman complained of in his EEOC complaint cannot be considered part of a continuing pattern of discrimination that would include the September, 1991 termination. In the Court's view, a liberal reading of Liberman's *pro se* papers, would reasonably place the failure to promote and termination claims as "links in a chain" of alleged continuous discriminatory conduct. *See Smith, supra,* 571 F.2d at 105. Accordingly, the Court declines to dismiss the plaintiff's failure to promote and termination claims as time barred based on a failure to satisfy exhaustion requirements.

## V. Conclusions

The plaintiff proved, by a preponderance of the evidence, that his national origin played a motivating factor in the decisions by IRS Taxpayers Service Representative Supervisor Connie Casiano with regard to his employment.

The defendant IRS proved, by a preponderance of the evidence, that the IRS would not have promoted the plaintiff as a result of three valid non-discriminatory reasons, which decision was made in the absence of any discriminatory motivation.

The Court finds that the plaintiff failed to prove that any adverse employment decision was made by the defendant IRS for a retaliatory motive.

The defendant IRS further proved by a preponderance of the evidence, that the decision to terminate the plaintiff was made based on three valid non-discriminatory reasons, and was not motivated by his national origin or religion.

Accordingly, for the reasons stated above, the Court directs the Clerk to enter a judgment in favor of the defendant, dismissing the complaint. The Clerk is also directed to close this case.